## In re FRANKLIN MUTUAL FUNDS FEE LITIGATION

### No. MASTER FILE 04–CV–982.

United States District Court,
D. New Jersey.

Sept. 9, 2005.

As Amended Sept. 22, 2005.

---

Patrick L. Rocco, Jennifer A. Sullivan, Shalov Stone & Bonner LLP, Morristown, Jerome M. Congress, Janine L. Pollack, Kim E. Miller, Michael R. Reese, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Plaintiffs.

Joseph T. Boccassini, Gregory J. Hindy, Alitia F. Stockwell, Christine Ammerman, McCarter & English, LLP, Newark, Daniel A. Pollack, Martin I. Kaminsky, Edward T. McDermott, Anthony Zaccaria, Pollack & Kaminsky, New York, NY, for Defendants Franklin Resources, Inc., Franklin Advisers, Inc., Franklin Private Client Group, Inc., Franklin Mutual Advisers, LLC, Fiduciary International, Inc., Franklin Templeton Distributors, Inc., and Templeton/Franklin Investment Services.

Michael R. Griffinger, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Defendants Harry J. Ashton, S. Joseph Fortunato, and Gordon S. Macklin.

## OPINION

MARTINI, District Judge.

This is a putative class action brought on behalf of all persons or entities who owned one or more shares of the named Franklin and Templeton Mutual Funds against Franklin Resources, Inc. and its subsidiaries and affiliates for, among other reasons, charging mutual fund investors excessive fees and expenses, disseminating materially false and misleading information, and improperly paying brokers to steer unsuspecting investors into the Franklin and Templeton Mutual Funds. Defendants filed a Motion to Dismiss the Consolidated Amended Complaint pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.[1] Plaintiffs opposed that motion, and subsequently filed a Motion for Class Certification. Plaintiffs have also filed a Motion for Leave to File Supplemental Reply Brief in Support of Its Motion for Class Certification. For the reasons stated below, defendants' motion to dismiss is **GRANTED**, and plaintiffs' motion for class certification and motion for leave to file a supplemental reply brief are **DENIED**.

## BACKGROUND

### I. Introduction

A mutual fund consists of a pool of assets, usually in the form of a portfolio of investments, that is owned by its shareholders. A mutual fund is typically organized by an investment management company or a financial institution. It is organized under state law, much like a corporation, and has its own board of directors who are supposed to represent and protect the interests of its shareholders. However, unlike a corporation, a mutual fund is generally not run by its employees. Most mutual funds are man-

1. Technically, seven defendants moved to dismiss the Consolidated Amended Complaint. Those original defendants are: Franklin Resources, Inc., Franklin Advisers, Inc., Franklin Private Client Group, Inc., Franklin Mutual Advisers, LLC, Fiduciary International, Inc., Franklin Templeton Distributors, Inc. and Templeton/Franklin Investment Services.

It appears that they were the only defendants to move for dismissal at that time because the vast majority of defendants had yet to be served with process. Subsequently, by letter dated March 18, 2005, defendants Harry J. Ashton, S. Joseph Fortunato and Gordon S. Macklin joined in the motion.

aged by organizations referred to as investment advisers. An investment adviser manages the day-to-day operations and selects investment opportunities for the fund's portfolio. The investment adviser is usually affiliated with the entity that organized the fund.

An investment adviser and fund enter into an advisory agreement. *See* 15 U.S.C. §§ 80a–15(a), (c). The advisory agreement typically provides that the investment adviser will receive a percentage of net assets under management as an advisory fee. Given the unusual position of the investment adviser visà-vis the mutual fund, and the fact that a greater amount of net assets under management does not necessarily correlate with greater returns to a fund's shareholders, but in fact may impinge on greater returns, the relationship between the investment adviser and fund has been characterized as "fraught with potential conflicts of interest." *Burks v. Lasker*, 441 U.S. 471, 481, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). Those "potential conflicts of interest" are at the root of this action.

## II. Facts

This is a consolidated action brought by plaintiffs Steven R. Alexander IRA, Frank Tricarico and Cathy Wilcox.[2] Plaintiffs are shareholders in three mutual funds which are named defendants in this action: Templeton Foreign Fund, Franklin Income Fund, and Franklin Mutual Discovery Fund. (Consolidated Am. Compl. (hereinafter "Compl.") ¶¶ 15–17). They, however, seek to maintain a class action on behalf of all investors who owned shares in any of 103 Franklin and Templeton Mutual Funds (hereinafter the "Franklin Funds" or "Funds") during the period from March 2, 1999 to November 17, 2003, and therefore name the additional 100 Funds as nominal defendants. The Franklin Funds are open-end investment companies that are registered with the Securities and Exchange Commission ("SEC") under the federal securities laws. Many of the Funds share common boards of directors, investment advisers and principal underwriters and distributors. It is unclear from the Complaint, however, which directors, investment advisers and principal underwriters and distributors are associated with which mutual funds.

Defendant Franklin Resources, Inc. ("Franklin") provides, through its subsidiaries, "retail and institutional asset management services throughout the world under the name Franklin Templeton Investments." (Compl.¶ 7). Franklin is the ultimate parent entity of all of the named Franklin and/or Templeton defendants, including the investment adviser and distributor defendants. As of September 30, 2003, Franklin possessed $301.9 billion in assets under management. Franklin earns most of its revenue from the fees associated with the amount of assets under management. Generally speaking, if Franklin oversees more assets under management, it will generate greater revenues.

The defendant investment advisers are: Franklin Advisers, Inc., Templeton/Franklin Investment Services, Inc., Franklin Private Client Group, Inc., Franklin Mutual Advisors, Templeton Global Advisors Limited, Franklin Investment Advisory Services, Inc., Fiduciary International, Inc., Franklin Advisory Services, Templeton Investment Counsel, LLC. (*Id.* at ¶¶ 19–28). The investment adviser defendants were

---

**2.** Originally, the named plaintiffs had filed their own separate action on their own behalf and on the behalf of others similarly situated. In an order dated June 29, 2004, Magistrate Judge Ronald J. Hedges ordered that the three actions be consolidated as *In re Franklin Mutual Funds Fee Litigation*, Master File 04–CV–982 (WJM)(RJH).

responsible for managing the day-to-day operations of the Franklin Funds, including managing their investment portfolios. Pursuant to advisory agreements, the Funds paid the investment advisers fees calculated as a percentage of fund assets under management. (*Id.* at ¶ 28).

The defendant distributors performed the principal underwriting and distribution of mutual fund shares. Franklin/Templeton Distributors, Inc. was the distributor for most of Franklin's U.S.-registered open-end mutual funds. (*Id.* at ¶ 29). Templeton/Franklin Investment Services was the distributor for several of the Franklin Funds; those particular funds are not identified by the Complaint. (*Id.* at ¶ 30). Franklin generates underwriting and distribution fees primarily by entering into distribution agreements with the distributor defendants. (*Id.*).

Defendants Harris J. Ashton, S. Joseph Fortunato, Gordon S. Macklin, Charles B. Johnson, and Rupert H. Johnson, Jr. were directors, officers and/or trustees of the Franklin Funds (collectively referred to hereafter as the "director defendants").[3] Each director oversaw a minimum of at least 110 of the Franklin Funds or the Funds' investment portfolios during the relevant time period. (*Id.* at ¶¶ 32–33, 36, 39–40). During that same time period, two of these directors also served as officers for other defendants. Charles B. Johnson served as the Chairman of the Board for each of the Franklin Funds and as the Chief Executive Officer and Chairman of the Board for one of the distributor defendants. Rupert H. Johnson, Jr. served as the Vice Chairman of Franklin, Vice President of one of the distributor

defendants, and Senior Vice President of one of the investment adviser defendants. As of the end of 2002, the director defendants Ashton, Fortunato and Macklin received compensation ranging from $363,512 to $372,941.[4]

Plaintiffs allege that defendants (collectively referred to as "Franklin" in the Complaint) in conjunction with securities brokers engaged in a kickback scheme that benefitted everyone involved but the Funds and their shareholders. Essentially, the defendants made undisclosed payments to brokers to encourage them to push the Franklin Funds on unsuspecting investors. This practice was known as a "shelf-space" arrangement. (*Id.* at ¶ 48). In accordance with this arrangement, the brokers would give Franklin Funds priority placement when encouraging investors, *i.e.*, their clients, to invest in mutual funds. This led to more people investing in the Franklin Funds, causing the net asset value of the Funds to grow. As the net asset value of the Funds grew, the defendants began to collect greater compensation because they charged fees as a percentage of net asset value. As they collected greater compensation, they in turn, continued to make payments to brokerage firms to induce brokers to steer more investors into the Funds. (*Id.* at ¶ 2). And as the circle continued, and the Funds expanded, the brokers and defendants reaped the pecuniary rewards while the investors were left owning shares in ever-larger, less dynamic mutual funds laden with excessive fees.

Franklin allegedly used three forms of payment to encourage brokers to steer investors into the Franklin Funds: direct-

---

**3.** Although the Complaint identifies nine director defendants, four of them were dismissed pursuant to a Stipulation of Dismissal Without Prejudice entered on March 11, 2005.

**4.** The Complaint does not propound compensation for director defendants Charles B. Johnson or Rupert H. Johnson, Jr. Moreover, it is worth noting that of the four dismissed director defendants, two of them received less than $145,000 in compensation for 2002.

ed brokerage, excessive commissions, and revenue-sharing arrangements. "Directed brokerage" is the directing of trades of securities and other investments in a fund's portfolio to specific brokerage firms so that these firms receive the brokerage commissions associated with those trades. Plaintiffs allege that directed brokerage allowed brokers to receive "increased commissions." (*Id.* at ¶ 65). Further, with directed brokerage, the broker does not guarantee a "best execution" rate, the best rate available for the trading of securities at that time in the market. As a result, plaintiffs allege the Franklin Funds were charged more money for trading securities than they otherwise should have been. (*Id.* at ¶ 65).

Franklin also paid excessive commissions to brokers who participated in the "shelf-space" program as a means for providing them an incentive to sell shares in Franklin Funds rather than non-program funds. (*Id.* at ¶¶ 50–52). Excessive commissions were paid in part with the use of "soft dollar" arrangements. (*Id.* at ¶¶ 89–90). "Soft dollar" arrangements allow the investment advisers to package research services fees and brokerage commissions together. However, rather than use soft dollars and commissions for lawful, value-adding services, plaintiffs allege they were used to repay brokers for providing preferential treatment to the Franklin Funds.

Franklin also maintained its preferred status by entering into revenue-sharing arrangements with brokerage houses. According to the Complaint, the revenue-sharing arrangements allowed Franklin to "pay[ ] cash and other inducements" to brokerage firms out of the Funds' assets. (*Id.* at ¶ 47). The Complaint further alleges that the investment adviser defendants and/or distributor defendants "compensat-

ed themselves out of investor assets for any payment made pursuant to revenue sharing agreements." (*Id.* at ¶ 106(d)). How the investment advisers were able to establish and participate in these arrangements is not explained by the Complaint.

Franklin allegedly entered into "shelf-space" arrangements with several brokerages, including Morgan Stanley, Merrill Lynch, Salomon Smith Barney, A.G. Edwards and Wachovia Securities. (Compl.¶ 47). Morgan Stanley alone allegedly was paid millions of dollars in directed brokerages and other forms of payment to participate in such an arrangement. (*Id.* at ¶ 49). Defendants allegedly concealed these arrangements, and the concomitant shifting of monies from the Funds to the brokerages, by not disclosing this information in the Franklin Funds' prospectuses [5] or other public filings. This created potential conflicts of interest with brokers, who may have steered unwitting investors into the Franklin Funds for the sole purpose of increasing their commissions. Further, Franklin Funds shareholders were unaware at that time that fund assets were being depleted in a manner inimical to fund liquidity and performance.

As touched on above, the brokers were not the only beneficiaries of the shelf-space arrangements. The investment advisers, as well as other defendants, allegedly benefitted from the shelf-space arrangements through two types of fees: advisory fees, also referred to as management fees, and 12b–1 distribution and marketing fees. Both fees were assessed as a percentage of a particular fund's assets. Thus, as the size of the particular fund grew under the shelf-space arrangement, and assuming the percentage of the fees assessed re-

---

5. A prospectus discloses all material facts concerning a security, in this case a mutual fund or group of mutual funds, enabling in-

vestors to reach an informed decision as to whether to invest in or alter their position in that security. (Compl.¶ 102).

mained the same or increased, the investment advisers and/or other interested defendants received greater compensation.

Plaintiffs bring this action as a putative class action, asserting violations of Sections 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. §§ 80a–33(b), 80a–35(a) and (b) and 80a–47(a), Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), 15 U.S.C. §§ 80b–6 and 80b–15, and state law. Plaintiffs assert direct and derivative claims against the defendants. The Complaint sets forth the following ten Counts: (1) the investment adviser defendants and director defendants violated Section 34(b) of the ICA; (2) the distributor defendants, the investment adviser defendants and the director defendants violated Section 36(a) of the ICA; (3) the distributor defendants, the investment adviser defendants and the director defendants violated Section 36(b) of the ICA; (4) Franklin (as the control person of the distributor defendants and the investment adviser defendants) violated Section 48(a) of the ICA; (5) the investment adviser defendants violated Section 206 of the IAA; (6) all defendants violated the New Jersey Consumer Fraud Act; (7) the investment adviser defendants breached their fiduciary duty; (8) the director defendants breached their fiduciary duty; (9) all defendants aided and abetted the brokerages in breaching their fiduciary duty; and (10) all defendants were unjustly enriched. All Counts, except for Count 5, are brought on behalf of the putative class. Count 5 is brought derivatively on behalf of the Franklin Funds.

Defendants, in lieu of answering, filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), defendants argue that plaintiffs' claims are derivative in nature and, therefore, plaintiffs lack standing to bring direct claims, and lack standing to bring derivative

claims on behalf of any mutual fund except for the three in which they own shares. As such, Counts One through Four and Six through Ten, which assert direct claims, must be dismissed. Moreover, defendants contend that the remaining derivative claims in Count Five must be. dismissed because plaintiffs failed to comply with the demand rule under Maryland law. Under Rule 12(b)(6), defendants argue that there is no private right of action under Sections 36(a) and 34(b) and that plaintiffs' Section 36(b) claim is legally insufficient. Absent a cause of action under those sections, defendants argue that plaintiffs' claims under Section 48(a) are legally insufficient. Defendants also argue that the Court should, in its discretion, dismiss plaintiffs' state law claims under 28 U.S.C. § 1367, or, in the alternative, dismiss them as preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f).

Plaintiffs opposed that motion and filed a Motion for Class Certification and a Motion for Leave to File Supplemental Reply Brief in Support of Its Motion for Class Certification. These motions are now before the Court.

## DISCUSSION

### I. Standard of Review

■ The standard of review for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction varies depending on whether the defendant makes a facial or factual challenge. *Gould Elecs. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). The standard for reviewing a facial attack is similar to the standard governing a Rule 12(b)(6) motion. "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."

*Id.* at 176. In contrast, in reviewing a factual challenge, the allegations of the complaint are not accepted as true, and "the court may consider evidence outside the pleadings." *Id.* This case concerns a facial challenge.

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court may dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Zynn v. O'Donnell,* 688 F.2d 940, 941 (3d Cir.1982).

## II. Standing

The concept of standing is drawn directly from Article III, Section 2 of the Constitution. *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Article III standing goes to the very heart of a court's subject matter jurisdiction. It determines whether the court has jurisdiction to resolve a dispute on the merits. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *ACLU–NJ v. Township of Wall,* 246 F.3d 258, 261 (3d Cir.2001). Standing

may not be assumed; it is a threshold issue that must be addressed before turning to the merits. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Plaintiffs bear the burden of demonstrating standing. *ACLU–NJ,* 246 F.3d at 261.

Defendants argue that plaintiffs lack standing to assert class action claims on behalf of individual shareholders and derivative claims against any defendant except for the three funds that the plaintiffs owned at the time of filing suit. Plaintiffs respond that they have standing to bring claims on behalf of investors in the Franklin Fund Complex. They assert that they have individual standing to assert direct claims against the three owned mutual funds. Because they have individual standing, plaintiffs argue that their ability to assert claims on behalf of other investors in other funds is no longer an issue of standing. Rather, they contend the issue is one of class certification—whether the claims brought on behalf of other investors satisfy the prerequisites of Fed.R.Civ.P. 23.

The Court finds that plaintiffs' standing is more constrained than they assert. Standing is a threshold inquiry, not a mere hurdle that can be cleared with the assistance of Rule 23. To establish Article III standing, a plaintiff must demonstrate: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servcs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In accordance with those requirements, a named plaintiff can bring suit against a

party only if the plaintiff personally suffered an injury and that injury is traceable to that party. If a plaintiff cannot trace an injury to a defendant, the plaintiff lacks standing with regard to that defendant.

■■■ The standing inquiry does not change in the context of a putative class action. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). In other words, standing cannot be predicated on an injury which the plaintiff has not suffered, nor can it "be acquired through the back door of a class action."[6] *Allee v. Medrano*, 416 U.S. 802, 828–29, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (3d Cir.1970) ("[A] predicate to appellee's right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, he may not accomplish as a representative of a class.").

■■■ Thus, in order to establish standing in the class action context, for each named defendant, at least one named plaintiff must be able to allege injury traceable to that defendant. *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 544 (D.Nev.2004); *Ramos v. Patrician Equities Corp.*, 765 F.Supp. 1196, 1199 (S.D.N.Y.1991); *In re Eaton Vance Corp.*

*Sec. Litig.*, 219 F.R.D. 38, 41 (D.Mass. 2003). An inability to do so with regard to certain named defendants demonstrates an absence of standing as to claims asserted against those defendants.

Here, plaintiffs allege they were actually injured as a result of being the shareholders in three funds. Taking those allegations as true, plaintiffs have individual standing to assert claims against defendants associated with those three funds. Plaintiffs, however, do not assert an injury traceable to any other fund. Therefore, traditionally, they would lack standing to assert claims on behalf of other investors involving the defendants associated with the one hundred other fund defendants.

In the class action context, however, traditional notions of standing are not completely informative of what claims may be asserted. In *Haas v. Pittsburgh National Bank*, 526 F.2d 1083, 1088–89 (3d Cir. 1975), the Third Circuit held that a plaintiff could assert a claim on behalf of a class against a particular defendant even though she lacked standing to assert that claim because she had standing to assert two other closely related direct claims against that defendant. The Third Circuit distinguished this scenario from *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir.1973), where the named plaintiffs could assert no cause of action against certain named defendants and, as a result, those defendants were dismissed.

■■■ In light of *Haas*, plaintiffs may assert claims on behalf of investors in the one hundred other funds, but only to the extent that the named plaintiffs properly pleaded direct claims against those defen-

---

**6.** Indeed, Rule 23 cannot expand upon the Court's jurisdiction by loosening the standing requirement. Construing the rule in that manner would violate both the Rules Enabling Act, 28 U.S.C. § 2072, and the Federal Rules of Civil Procedure, Fed.R.Civ.P. 82.

*See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (stating that Rule 23's requirements are circumscribed by Article III constraints, the Rules Enabling Act, and Rule 82).

dants. In other words, if the named plaintiffs cannot or do not assert their own direct claim against a named defendant, they may not bring a claim against that defendant on behalf of other investors.[7] However, at this time, it is impossible to say which defendants are appropriately named because of the manner in which the plaintiffs drafted their Complaint. Plaintiffs did not link an investment adviser defendant, distributor defendant, or director defendant to a particular fund. Therefore, all investment adviser defendants, distributor defendants, and director defendants are dismissed. Moreover, for the same reason, the one hundred other fund defendants are also dismissed at this time. Plaintiffs will be given the opportunity to amend their Complaint and properly plead the bases for asserting claims against specific defendants. Because plaintiffs should be able to amend their Complaint with relative ease to satisfy the standing requirement, the Court will continue onward and consider the other arguments raised by defendants' motion to dismiss.

## III. Nature of the Asserted Claims—Direct vs. Derivative

 Before addressing the merits of each Count, defendants argue preliminarily that all of plaintiffs' class claims are actually derivative claims and, therefore, Counts One through Four and Six through Ten should be dismissed. Plaintiffs respond that these Counts are not derivative because the injuries alleged directly impacted them as shareholders. (Pls.' Opp'n Br. at 6). Because the Court finds that plaintiffs' alleged injuries are derivative, these Counts are dismissed as improperly pleaded.

 Whether plaintiffs' claims are direct or derivative is a question of state law. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 108, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). The Court must look to the law of the State of incorporation. *Id.* at 108–09, 111 S.Ct. 1711. Although the parties disagree over which States' law should govern—Maryland or Massachusetts—the Court concludes that the result is the same under each.[8] Under Maryland law, claims are direct if the shareholders' injury is distinct from the injury suffered by the corporation. *Tafflin v. Levitt,* 92 Md.App. 375, 608 A.2d 817, 820 (1992); *Strougo v. Bassini,* 282 F.3d 162, 171 (2d Cir.2002) ("Where shareholders suffer an injury that does not stem from an injury to the corporation's business or property, by contrast, the corporation lacks standing to

---

7. Plaintiffs argue in the alternative that they have standing to assert claims on behalf of investors in the Franklin Funds pursuant to the juridical link doctrine. (Pls.' Opp'n Br. at 11 n. 13). Plaintiffs, however, misconstrue the juridical link doctrine. The juridical link doctrine has no bearing on standing; rather, its place lies in a Rule 23 analysis. *See Matte v. Sunshine Mobile Homes, Inc.,* 270 F.Supp.2d 805, 822 (W.D.La.2003) (concluding that the "juridical links doctrine has no bearing on the issue of standing"); *Henry v. Circus Circus Casinos, Inc.,* 223 F.R.D. 541, 544 (D.Nev.2004) (stating that a "doctrine developed under Rule 23 based on judicial efficiency and expedience does not play a role in an Article III standing analysis"); *In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162,

171 (D.Mass.2004) (same). Consequently, it is not applicable.

8. Defendants assert Maryland law governs because the three funds owned by the named plaintiffs are organized under Maryland law. Plaintiffs maintain that Massachusetts law applies because a majority of the 103 mutual funds named as defendants are organized under Massachusetts law. Although some number of the mutual fund defendants are organized under the laws of Delaware, Illinois, and California, those laws do not materially differ from Maryland and Massachusetts when distinguishing between direct and derivative claims and, therefore, do not call for a separate analysis.

sue, and Maryland's 'distinct injury' rule allows shareholders access to the courts to seek compensation directly."). Similarly, under Massachusetts law, the issue turns on whether the shareholders suffered an injury distinct from the injury suffered by the corporation. *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F.Supp.2d 222, 233 (S.D.N.Y.2005); *see also Pagounis v. Pendleton*, 52 Mass.App.Ct. 270, 753 N.E.2d 808, 812 (2001) ("Any harm suffered by Pendleton was indirect in that it affected him merely as an owner of corporate stock, and the only remedy that might be available (other than a direct action by a corporation) was a stockholder's derivative suit."); *Jackson v. Stuhlfire*, 28 Mass.App. Ct. 924, 547 N.E.2d 1146, 1148 (1990) ("[T]he wrong underlying a derivative action is *indirect*, at least as to the shareholders. It adversely affects them merely as they are the owners of the corporate stock; only the corporation itself suffers the direct wrong.") (quoting Smith & Zobel, Mass. R. Prac. § 23.1.1 (1975)).

The Court must now look beyond plaintiffs' characterizations of their claims as direct and ascertain the true nature of the injuries alleged in the Complaint. Plaintiffs allege that the defendants breached their fiduciary duties, causing four types of injuries: (1) excessive advisory fees; (2) excessive 12b–1 marketing fees; (3) excessive director compensation; and (4) payments to brokerage firms (directed brokerage, excessive commissions, soft dollars, revenue sharing). (*See, e.g.*, Compl. ¶¶ 5, 47, 80, 85, 130, 138). Plaintiffs assert these injuries are all direct injuries because they "reduced the Funds' net asset value per share, decreasing the amount by which each shareholder is entitled to redeem his or her shares." [9] (Pls.' Opp'n Br. at 8). In essence, plaintiffs argue that

these injuries are direct because mutual funds have a unique structure:

> "A mutual fund share represents a fractional ownership in a large investment account. It is, in essence, a service contract between the investor and the investment company whereby the investor places his money in the hands of the investment company in expectation of realizing a financial gain."

(*Id.*) (quoting *Baum v. Investors Diversified Servs., Inc.*, 409 F.2d 872, 874 (7th Cir.1969)). Thus, according to plaintiffs, a mutual fund is merely a vehicle by which investors pool their money in a company to realize a financial gain and, therefore, any injury to the pool of money is not an injury to the fund, but to the investors directly.

This structural argument was rejected by the Third Circuit in *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727 (3d Cir.1970). In that case, the appellee argued that the mutual fund is a "novel corporate structure" because the "redemptive value of mutual fund shares bears a direct relationship to the total net assets owned by the fund." *Id.* at 733. This relationship allegedly conferred upon the fund shareholder a primary right to sue because any damage to the net value of the total assets directly affected the redemptive value of the shares. The Third Circuit found this to be an inadequate basis to distinguish between a corporation and mutual fund, stating:

> That the worth of a share of appellee's stock is directly proportionate to the value of a mutual fund's net assets is insufficient to destroy these separate identities, to alter the basic shareholder-corporation relationship, and to thereby confer upon appellee legal rights peculiar to the corporation. Nowhere in the cases do we find authority for the propo-

9. Notably, plaintiffs argue in Count Five that the very same injuries resulting from exces-

sive fees and charges are derivative. (*See* Compl. ¶¶ 151, 153). ✦

sition that the ease and capacity of evaluating a shareholder's redemptive value of mutual fund shares can vest in him a pro-rata share of the corporation's primary right to sue. To accept this would be to convert an orthodox corporate structure to a general partnership or joint venture with each participant a principal and agent for the others.

*Id.* at 733. The Third Circuit went on to say that to accept the appellee's position would vitiate the distinction between derivative and direct claims, providing the shareholder with a direct claim merely by recasting the harm to the fund as a personal injury to each shareholder. *Id.*

In light of the above, the Court concludes that all of plaintiffs' alleged injuries are derivative. Because the excessive fees and charges reduced the net asset value of the funds and, in turn, reduced the net asset per share value, the plaintiffs did not sustain an injury distinct from that suffered by the funds. As articulated by the Second Circuit, "[u]nderwriter fees, advisory fees, and other transaction costs incurred by a corporation decrease share price primarily because they deplete the corporation's assets, precisely the type of injury to the corporation that can be redressed under Maryland law only through a suit brought on behalf of the corporation." *Strougo v. Bassini,* 282 F.3d 162, 174 (2d Cir.2002); *see also Green v. Nuveen Advisory Corp.,* 186 F.R.D. 486, 490 (N.D.Ill.1999) ("Diminution in value of the common stock due to advisory fees paid by the Funds is an injury to the Funds, and any harm to the plaintiffs as common shareholders is derivative in nature."); *In re Dreyfus Aggressive Growth Mut. Fund Litig.,* No. 98–4318, 2000 WL 10211, at *1, *4 (S.D.N.Y. Jan.6, 2000) (finding that undisclosed, self-dealing transactions by the portfolio manager and heavy investment in risky "micro-cap" stocks were derivative causes of action); *Blasberg v. Oxbow Power Corp.,* 934 F.Supp. 21, 26 (D.Mass.1996)

("If a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in the diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 260–61 (S.D.N.Y.2003) (finding that diminution in value of the fund due to purchases of securities for the fund at inflated prices and payment of excessive advisory fees is derivative). Consequently, the injuries alleged in the Complaint are derivative.

In summary, the Court must dismiss Counts One through Four and Six through Ten because they are improperly pleaded as direct Counts.

## IV. Sections 34(b) and 36(a) of the Investment Company Act

Plaintiffs assert direct claims on behalf of the putative class under §§ 34(b) and 36(a) of the ICA in Counts One and Two, respectively. Defendants argue that these Counts must be dismissed because these sections of the ICA do not provide shareholders with a private right of action. Plaintiffs disagree. Because the Court finds that neither section provides a private right of action, both Counts must be dismissed.

It is undisputed that §§ 34(b) and 36(a) provide no explicit private right of action. Therefore, in order for plaintiffs to be able to assert claims under those sections, this Court must find that Congress intended plaintiffs to be provided with an implied private right of action.

To determine whether a statute provides an implied right of action, the Court must look to Congress' intent. It is the Court's role to "interpret the statute Congress has passed to determine whether it displays an intent to create not just a

private *right* but also a private *remedy.*" *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (emphasis added); *Gonzaga Univ. v. Doe,* 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Statutory intent is the *sine qua non* of an implied right of action. Absent congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval,* 532 U.S. at 286–87, 121 S.Ct. 1511.

In the past, courts had greater flexibility when determining whether a statute contained an implied right of action. Before recent Supreme Court cases, courts were to find implied rights of action when necessary to effectuate the congressional purpose embodied in a statute. *Id.* at 287, 121 S.Ct. 1511. This vague and permissive model of analysis, which the Supreme Court has characterized as an *"ancien regime"*,[10] resulted in courts frequently finding implied rights of action to promote statutory policies or benefit a special class. Recently, however, this *ancien regime* has been cast aside for a more structured, focused analysis on the wording of the statute itself. Now the search for congressional intent begins with and remains on the text and structure of the statute. *Id.* at 288, 121 S.Ct. 1511.

 Under the new regime of statutory construction, a court looks to see if the statute contains rights-creating language. *Sandoval,* 532 U.S. at 288–89, 121 S.Ct. 1511. A statute contains rights-creating language when its text is unmistakably phrased in terms of the persons benefitted. *Gonzaga,* 536 U.S. at 284, 122 S.Ct. 2268. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of per-

sons.'" *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511 (quoting *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)). Second, a court must also examine whether Congress intended to create a private method for enforcing the substantive rule provided by the statute. *Id.* "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others. Sometimes the suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would-be plaintiff 'a member of the class for whose benefit the statute was enacted') suggest the contrary." *Id.* at 290, 121 S.Ct. 1511 (citations omitted). Further, if another section of that statute provides an explicit private method of enforcement, that "suggests that omission of an explicit private right to enforce other sections was intentional." *Olmsted v. Pruco Life Ins. Co. of New Jersey,* 283 F.3d 429, 433 (2d Cir.2002).

Applying that framework, this Court concludes that §§ 34(b) and 36(a) do not provide a private right of action. Although neither the Supreme Court nor any circuit court of appeals has yet to address this issue, the Supreme Court cases *Sandoval* and *Gonzaga,* and subsequent lower court cases that have addressed implied rights of action under sections of the ICA, provide ample justification for this Court's conclusion. In *Olmsted v. Pruco Life Insurance Co. of New Jersey,* the Second Circuit, the only circuit court to date to have analyzed the existence of implied rights of action in the ICA under the new regime, found no implied right of action under §§ 26(f) and 27(i) of the ICA. 283 F.3d 429, 436 (2d Cir.2002). Relying on *Sandoval,* the *Olmsted* court began its analysis by stating that "[a] court must

---

**10.** *Sandoval,* 532 U.S. at 287, 121 S.Ct. 1511.

'begin [its] search for Congress's intent with the text and structure' of the statute, and cannot ordinarily conclude Congress intended to create a right of action when none was explicitly provided." *Id.* at 432 (citations omitted). After finding that neither § 26(f) nor § 27(i) explicitly provides for a private right of action, the court took the position that "we must presume that Congress did not intend one." *Id.* The Second Circuit found that this presumption was buttressed by three additional aspects of the statute. First, both sections "do not contain rights-creating language." *Id.* at 432. The language of the sections focused on the person regulated, not the individuals protected. Second, the ICA provides for another means of enforcing these sections. *Id.* at 433. Section 42 of the ICA explicitly provides for enforcement of all ICA sections, including §§ 26(f) and 27(i), by the SEC. In light of the Supreme Court's observation in *Sandoval* that an express provision for one method of enforcing a substantive rule strongly suggests that Congress intended to preclude others, § 42 undermined the contention that the sections in question provided a private right of action. And third, Congress explicitly provided a private right of action in § 36(b). *Id.* This demonstrated that when Congress intended to provide individuals with a private right of action, it knew how to do so; and the absence of such explicit language in §§ 26(f) and 27(i) made it likely that Congress never intended to imbue them with a private right of action.

Although *Olmsted* dealt with sections of the ICA not at issue in this case, its analysis is persuasive. Indeed, those district courts that have adhered to the new regime when determining whether implied rights of action exist under §§ 34(b) and 36(a) rely on *Olmsted* and its cogent analysis. And, in doing so, those courts have held that §§ 34(b) and 36(a) do not provide an implied private cause of action. *See In*

*re Eaton Vance Mut. Funds Fee Litig.,* 380 F.Supp.2d 222, 233 (holding that §§ 34(b) and 36(a) do not provide a private right of action); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 259 (S.D.N.Y.2003) (holding that § 34(b) does not provide a private right of action); *White v. Heartland High– Yield Mun. Bond Fund,* 237 F.Supp.2d 982, 986–88 (E.D.Wis.2002) (same); *Dorchester Investors v. Peak Int'l Ltd.,* 134 F.Supp.2d 569, 581 (S.D.N.Y.2001) (same).

Plaintiffs proffer three reasons why the Court should deviate from *Olmsted* and its progeny and recognize a private right of action under §§ 34(b) and 36(a) of the ICA. These reasons fail, however, because they are predicated on the old regime of statutory construction. First, plaintiffs maintain that in order for the Court to conclude that there is no private right of action under these sections, the Court must ignore decades of precedent clearly establishing private rights of action under the ICA. This argument is erroneous. This Court is not deviating from any binding precedent. Neither the Supreme Court nor the Third Circuit has found a private right of action under either section. Although the Third Circuit found an implied right of action under § 12(d)(1)(A) of the ICA in *Bancroft Convertible Fund, Inc. v. Zico Investment Holdings, Inc.,* 825 F.2d 731 (3d Cir.1987), its finding was made under the old regime. To the extent plaintiffs suggest this Court is bound by *Bancroft,* clearly the newer Supreme Court cases *Sandoval* and *Gonzaga,* casting aside the old regime, trump. Further, to the extent plaintiffs suggest that this Court should follow decisions rendered without the benefit of *Gonzaga* and *Sandoval,* those decisions are entitled to little or no weight. *See Olmsted,* 283 F.3d at 433–34 (declining to defer to a long line of decisions finding an implied right of action under the ICA decided under the *ancien regime* ). For these reasons, plaintiffs'

proffered authority is neither binding nor persuasive.

■ Second, plaintiffs insist that subsequent legislative history, namely legislative history generated in 1980, demonstrates that Congress intended for there to be implied rights of action under both sections. However, subsequent legislative history deserves little weight when attempting to ascertain the existence of an implied right of action in an earlier statute. *See Central Bank,* 511 U.S. at 185, 114 S.Ct. 1439 ("But '[w]e have observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute.'") (citation omitted); *see also White v. Heartland High–Yield Mun. Bond Fund,* 237 F.Supp.2d at 987 (rejecting attempted use of 1980 legislative history to inject an implied right of action into § 34(b)). Consequently, plaintiffs' appeal to subsequent legislative history is inapt and cannot overcome the presumption that Congress did not provide an implied right of action for those sections.[11]

Third, plaintiffs argue that under the new regime, a court must examine whether the statute discusses "the individuals [to be] protected." (Pls.' Opp'n Br. at 30, quoting *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511). Plaintiffs assert that these sections state they are for "the protection of investors," and thus Congress meant to imply a private right of action. This argument is misguided. Importantly, neither § 34(b) nor § 36(a) provides rights-creating language. Further, in sharp contrast to both sections, § 36(b) does. *See* 15 U.S.C. § 80a–35(b) (stating that "[a]n action may be brought under this subsection by the Commission, *or a security holder*") (emphasis added). As the Second Circuit articulated in *Olmsted,* "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional." 283 F.3d at 433. Consequently, looking at the text and structure of those sections, this Court finds no support for an implied private right of action.

In sum, the Court concludes that neither § 34(b) nor § 36(a) provides a private right of action. Consequently, Counts One and Two must be dismissed.

## V. Section 36(b) of the Investment Company Act

■ Count Three asserts direct claims under § 36(b) of the ICA. Defendants argue that because a private right of action under § 36(b) can only assert derivative claims, Count Three must be dismissed. Plaintiffs respond that direct claims are properly asserted under § 36(b). Because the Court concludes that shareholders do not have a primary or direct right of action under § 36(b) of the ICA, Count Three must be dismissed.

---

11. Also unpersuasive is plaintiffs' argument that the Court should find an implied right of action under § 34(b) because Congress never expressed dissatisfaction with courts that found implied rights of action under the ICA even though it had ample opportunity to do so. The Supreme Court rejected that proposition in *Central Bank:*

It does not follow ... that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it. It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the [courts'] statutory interpretation.... Congress may legislate, moreover, only through the passage of a bill which is approved by both Houses and signed by the President. Congressional inaction cannot amend a duly enacted statute.

*Central Bank,* 511 U.S. at 186, 114 S.Ct. 1439 (citation omitted). Since silence after the passage of a statute is even more attenuated than subsequent legislative history, nothing will be read into Congress' alleged silent acquiescence.

Section 36(b) states in relevant part: "An action may be brought under this subsection ... *by a security holder* of such registered investment company *on behalf of such company* ...." 15 U.S.C. § 80a–35(b) (emphasis added). In *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984), the Supreme Court addressed the "on behalf of" language, stating unequivocally that § 36(b) confers only a derivative right:

> [t]he "on behalf" language in § 36(b) indicates only that the right asserted by a shareholder suing under the statute is a "right of the corporation"—a proposition confirmed by other aspects of the action: The fiduciary duty imposed on advisors by § 36(b) is owed to the company itself as well as its shareholders and any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff. *See* S.Rep. No. 91–184, p. 6 (1970); § 36(b)(3). In this respect, a § 36(b) action is undeniably "derivative" in the broad sense of the word.

464 U.S. at 535 n. 11, 104 S.Ct. 831. To the extent that *Fox* distinguished a derivative claim under § 36(b) from a typical derivative claim, the Court did so to explain why Fed.R.Civ.P. 23.1 is inapplicable to § 36(b) actions. Thus, given the plain language of § 36(b) and the Supreme Court's elucidation of that provision in *Fox*, only derivative claims may be maintained under § 36(b). *Cf. Olmsted*, 283 F.3d at 433 ("Congress explicitly provided in § 36(b) of the ICA for a private right of *derivative action* for investors in regulated investment companies alleging that investment advisors breached certain fiduciary duties.") (emphasis added).

Plaintiffs argue that *Fox* stands for the proposition that "a plaintiff's right to sue under § 36(b) is primary because mutual funds themselves have no claim under § 36(b)." (Pls.' Opp'n Br. at 17). Plaintiffs, however, misconstrue *Fox*. Although shareholders do have a right to sue under § 36(b), and funds do not, that does not constrain or shed light on the nature of the claims that a shareholder may bring under § 36(b). As stated in *Fox*, a § 36(b) action is undeniably derivative.[12]

In sum, Count Three must be dismissed because § 36(b) does not provide for a direct private right of action.[13]

---

**12.** The Supreme Court's decision *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) does not change this conclusion. In dicta, the Court, relying on *Fox*, imprecisely stated that "a shareholder action 'on behalf of' the company under § 36(b) is direct rather than derivative and can therefore be maintained without *any* precomplaint demand on the directors." 500 U.S. at 108, 111 S.Ct. 1711 (emphasis in original). However, neither *Kamen* nor *Fox*, the authority relied on for that statement, stand for the broad proposition that an action under § 36(b) is direct, in every sense of the word. Indeed, if that statement is examined in its context, the very next sentence clarifies that "[u]nder these circumstances, it can hardly be maintained that a shareholder's exercise of his state-created prerogative to initiate a *derivative suit* without the consent of the directors frustrates the broader policy objectives of the ICA." *Kamen*, 500 U.S. at 108, 111 S.Ct. 1711 (emphasis added). Thus, the statement appears to state no more than the incontestable proposition that a shareholder may bring a derivative claim under § 36(b) directly, meaning without making a precomplaint demand pursuant to Rule 23.1. However, that suit remains a derivative action brought on behalf of the company.

**13.** If plaintiffs amend their Complaint to recast the injuries alleged in Count Three as derivative, they should remain cognizant that derivative claims may only be brought against the three funds they owned and that they may not maintain a "class derivative action." *See Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 735 (3d Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971).

## VI. Section 48 of the Investment Company Act

 Plaintiffs's Count Four alleges Franklin, as a control person, violated § 48 of the ICA. Section 48 is a secondary liability section, stating in relevant part: "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder." 15 U.S.C. § 80a–47(a). Thus, liability under § 48 is predicated upon a violation of another section of the ICA.

Here, the bases for primary liability under the ICA, as determined by plaintiffs' Complaint, are alleged violations of §§ 34(b), 36(a) and 36(b). (*See* Compl. at ¶¶ 141–42). Because those claims have been dismissed, they cannot form the basis for liability under § 48. Without any basis for primary liability, at this time, Count Four must be dismissed.

## VII. Section 215 of the Investment Advisers Act

 Plaintiffs in Count Five of the Complaint assert that pursuant to § 215 of the IAA, 15 U.S.C. § 80b–15, the investment adviser defendants violated § 206 of the IAA, 15 U.S.C. § 80b–6, by charging improper Rule 12b–1 marketing fees and making improper payments to brokerage firms, including excessive commissions, soft dollars, and directed brokerage. (Compl.¶¶ 146–53). Plaintiffs bring this claim derivatively on behalf of the mutual funds.

Defendants assert that the derivative causes of action alleged in Count Five should be dismissed for failure to make a demand on the directors. Defendants argue that because plaintiffs' allegations of futility are insufficient under Maryland law, they were required to make a demand. Because plaintiffs did not make a demand, defendants argue that Count Five must be dismissed. Plaintiffs respond that demand is excused because they have adequately pleaded futility.

Pre-suit demand is both a substantive and pleading prerequisite. The policy underlying the demand rule is

> to "affor[d] the directors an opportunity to exercise their reasonable business judgment and 'waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" Ordinarily, it is only when demand is excused that the shareholder enjoys the right to initiate "suit on behalf of his corporation in disregard of the directors' wishes." In our view, the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of "substance," not "procedure."

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (citations omitted). The demand requirement plays the vital role of providing directors with the opportunity to resolve issues in dispute and thereby avoid extensive and expensive litigation. *Werbowsky v. Collomb*, 362 Md. 581, 766 A.2d 123, 143–44 (2001).

 Demand may be excused where a shareholder can demonstrate futility. Futility must be pleaded with particularity. Fed.R.Civ.P. 23.1. The standard for futility is determined by the law of a fund's state of incorporation. *Kamen*, 500 U.S. at 108–09, 111 S.Ct. 1711. Here, the relevant funds are incorporated in Maryland. Under Maryland law, futility is a "very limited exception" to the demand requirement. *Werbowsky*, 766 A.2d at 144. In order to show futility, a plaintiff must demonstrate that: "(1) a demand, or

a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id.* An outside director is presumed to be disinterested. *See* Md. Code Ann. Corps. & Assns. § 2–405.3; 15 U.S.C. §§ 80a–2(a)(9), (19).

Plaintiffs argue that they have shown futility under the second prong of this test. They argue that because the directors were appointed by the investment adviser defendants, served on multiple boards (over one hundred), received substantial compensation (ranging from $140,500 to $372,941), and wrongfully approved of the advisory fees, 12b–1 marketing fees, soft dollars, and misleading disclosures in prospectuses, a majority of the directors are not independent and demand is excused. (Compl.¶¶ 92–100).

Plaintiffs' allegations of futility, however, do not appear to satisfy Maryland's test. First, prong two requires a plaintiff to plead that a *majority* of the board is interested. Here, although plaintiffs offer the bald conclusion that a majority of the board is interested, they do not demonstrate that the directors who are allegedly interested constitute a majority of the board for any of the three funds. Indeed, there is no indication how many directors were on the boards of these funds, or which directors sat on these boards, except for an allegation that Charles B. Johnson sat on each and every board. (*See* Compl. ¶ 43). Moreover, it is unclear how the dismissal of four director defendants from this lawsuit impacts this analysis. Thus, there is no basis for this Court to conclude that even if the named director defendants are "interested," they constitute a majority of the relevant boards.

Second, substantively, plaintiffs' futility allegations appear wanting. Plaintiffs, through their Complaint and opposition brief, proffer several reasons why the directors are interested. Plaintiffs allege, in part, that the directors (1) were appointed by the investment advisors, (2) served on multiple boards, and (3) received substantial compensation. Under Maryland law, plaintiffs' allegations that the directors were chosen by the investment advisers, sat on multiple boards and received substantial compensation are, by themselves, insufficient to demonstrate that the directors are interested. *Werbowsky,* 766 A.2d at 145–46; *Krantz v. Prudential Investments Fund Mgmt. LLC,* 305 F.3d 140, 143–44 (3d Cir.2002); *see also Krantz v. Fidelity Mgmt. & Research Co.,* 98 F.Supp.2d 150, 155–57 (D.Mass.2000) (holding that directors' membership on 237 mutual fund boards, and substantial compensation from between $220,000 and $273,000 did not render the directors "interested" under the ICA); *Scalisi v. Fund Asset Mgmt., L.P.,* 380 F.3d 133, 136, 142 (2d Cir.2004) (holding that the directors' selection by the parent company and investment adviser, membership on 49 mutual fund boards, and substantial salaries from between $160,000 and $260,000 did not excuse demand).

Plaintiffs also allege that demand is excused because the directors wrongfully approved of the advisory fees, 12b–1 marketing fees, soft dollars, and misleading disclosures in prospectuses. Mere approval of the challenged transactions, however, is not enough to excuse the failure to make a demand. *Werbowsky,* 766 A.2d at 143–44. Further, given the overall vagueness of the assertions made by plaintiffs concerning these fees as they apply to all 103 named mutual funds, the Court cannot discern whether these alleged wrongful transactions took place with regard to the

three relevant funds. Consequently, at this time, the Court cannot determine whether these accusations support the futility exception.

In sum, Count Five must be dismissed for failure to adequately plead futility. Plaintiffs will be given the opportunity to amend their § 215 causes of action to plead with particularity allegations of futility and rebut the presumption of director independence.

## VIII. New Jersey Consumer Fraud Act Claim

Plaintiffs assert all defendants violated the New Jersey Consumer Fraud Act in Count Six of the Complaint. Defendants moved to dismiss this Count on the basis that this claim is not recognized under New Jersey law, citing *Waterloov Gutter Protection Sys. Co. v. Absolute Gutter Protection, L.L.C.*, 64 F.Supp.2d 398, 424 (D.N.J.1999). Plaintiffs acknowledge that defendants are correct and that Count Six fails to state a viable claim under the New Jersey Consumer Fraud Act. (Pls.' Opp'n Br. at 36 n. 26). Thus, Count Six must be dismissed.

## IX. Plaintiffs' Remaining State Law Claims

Plaintiffs' Counts Seven through Ten allege state law claims of breach of fiduciary duty against the investment adviser defendants and director defendants, aiding and abetting the breach of fiduciary duty against all defendants, and unjust enrichment against all defendants. As discussed above, because plaintiffs pleaded these claims as direct claims when they are in fact derivative claims, they must be dismissed. Moreover, even assuming *arguendo* that plaintiffs' claims are properly pleaded as direct claims, they still must be dismissed, only this time as preempted under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), specifically 15 U.S.C. § 78bb(f).

SLUSA mandates preemption when the complaint alleges: (1) a "covered class action" (2) based on state law claims concerning (3) the purchase or sale of a "covered security" and (4) the defendant misrepresented or omitted a material fact "in connection with" the purchase or sale of such security. 15 U.S.C. § 78bb(f)(1). Plaintiffs do not dispute that Counts Seven through Ten satisfy the first three elements of the SLUSA preemption test. The putative class size exceeds fifty shareholders, constituting a "covered class action." *See* 15 U.S.C. § 78bb(f)(5)(B); *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 298 n. 4 (3d Cir.2005). The Counts allege state law claims. And mutual fund shares are "covered securities." *See* 15 U.S.C. § 78bb(f)(5)(E); *Kircher v. Putnam Funds Trust*, 403 F.3d 478, 481 (7th Cir. 2005).

Rather, plaintiffs dispute that the allegations in Counts Seven through Ten satisfy the fourth prong of the SLUSA test—whether plaintiffs' state law claims arise "in connection with the purchase or sale" of securities. Plaintiffs contend that their claims do not meet the fourth prong because they "are asserted only on behalf of persons in their capacity as *holders,* not as purchasers or sellers." (Pls.' Opp'n Br. at 36, emphasis in original). Plaintiffs' position, however, is untenable given the Third Circuit's construction of the "in connection with" language of SLUSA.

Recently, in *Rowinski v. Salomon Smith Barney,* 398 F.3d 294 (3d Cir.2005), the Third Circuit broadly construed the phrase "in connection with." In doing so, it formulated a flexible test for determining whether a scheme is "in connection with" the purchase or sale of securities:

[F]irst, whether the covered class action alleges a "fraudulent scheme" that "coincides" with the purchase or sale of

securities[;] second, whether the complaint alleges a material misrepresentation or omission "disseminated to the public in a medium upon which a reasonable investor would rely[;]" third, whether the nature of the parties' relationship is such that it necessarily involves the purchase or sale of securities[;] ... fourth, whether the prayer for relief "connects" the state law claims to the purchase or sale of securities[; and fifth, any other considerations that may be relevant.]

*Id.* at 302 (citations omitted).

To better understand this test and its application to the facts before the Court, it is worth examining *Rowinski* in greater detail. In that case, plaintiff asserted state law claims on behalf of others similarly situated alleging that Salomon Smith Barney violated state laws by disseminating biased research that favored the firm's investment banking clients and injured its retail brokerage customers. In his prayer for relief, Rowinski sought damages in the amount of any and all fees and charges imposed by Salomon Smith Barney, and all compensatory damages. Plaintiff argued that the "in connection with" element of SLUSA preemption was not met. The Third Circuit disagreed, finding that plaintiff's claims were preempted.

First, the court found that the complaint alleged a fraudulent scheme that coincided with the purchase or sale of securities. The very essence of that scheme required that investors purchase the misrepresented securities. The court recognized that "[a]bsent purchases by 'duped' investors and a corresponding inflation in the share price, Salomon Smith Barney's biased analysis would fail to benefit its banking clients and, in turn, would fail to yield hundreds of millions of dollars in investment banking fees." *Id.* at 302. Second, the court found that Salomon Smith Barney made material misrepresentations

regarding the value of securities in investment research reports, a medium the investing public could reasonably rely upon. Third, the court found that the nature of the relationship between the parties—the broker/investor relationship—exists for the very purpose of trading in securities. In that case, where the class claims alleged misleading investment advice, the court found that such a relationship will almost certainly involve "purchasers" and "sellers" of securities. *Id.* at 303. And fourth, the court found that the recovery sought by plaintiff, which included trading fees and commissions, encompassed "charges incurred only in connection with the purchase or sale of securities." *Id.* In light of those findings, the Third Circuit found that Rowinski's state law class claims were preempted by SLUSA.

After examining this case under *Rowinski*'s flexible test, the Court concludes that plaintiffs' state law claims satisfy the "in connection with" requirement. Plaintiffs' state law claims allege that defendants engaged in a fraudulent scheme, the purpose of which was to push investors into mutual funds in order to increase fees and other charges, thereby injuring shareholders. As in *Rowinski*, the only way for this scheme to succeed was for investors to purchase securities (shares of the defendant mutual funds). Thus, defendants' fraudulent scheme necessarily "coincided" with the purchase of securities.

Moreover, there is little doubt that the Counts are based, in part, on material misrepresentations and/or omissions conveyed to the public in the funds' prospectuses, which, like the investment research reports in *Rowinski*, a reasonable investor would rely upon. After all, plaintiffs contend that the prospectuses' failure to disclose information regarding the funds' revenue sharing, directed brokerage, 12b–1 fees and soft dollars affected investors

when they were deciding whether to invest in the funds. (*See* Compl. ¶¶ 101–10). Further, because the allegedly fraudulent shelf-space scheme depended upon brokers "duping" investors to buy the defendant funds, as in *Rowinski*, this scheme included relationships involving the trading of securities.

And finally, the recovery plaintiffs seek here clearly "connects" the state law claims to the purchase of securities. Plaintiffs seek recovery of compensatory damages for all damages sustained as a result of defendants' wrongdoing and, among other things, recovery of all unlawfully obtained fees and charges. (*See* Compl. p. 57). As alleged, the fees and charges imposed on the funds either precipitated and/or perpetuated the shelf-space arrangements. Thus, as in *Rowinski*, the fees, charges and compensatory damages sought encompass charges incurred in connection with the purchase of securities.

 Plaintiffs argue that their state law claims do not satisfy the "in connection with" requirement because the Complaint, as drafted, only focuses on claims of "holders," not purchasers or sellers. Plaintiffs, however, are incorrect. It is well-established that an artfully drafted complaint cannot circumvent SLUSA preemption. *See, e.g., Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 33–34 (2d Cir.2005). Rather, a court is required to look at the essence of a complaint. *Id.* at 34; *Dudek v. Prudential Sec., Inc.,* 295 F.3d 875, 879 (8th Cir.2002).

In *Rowinski*, the plaintiff made the same argument. There, the plaintiff attempted to distinguish his case by arguing that the dissemination of misleading investment advice did not concern purchasers and sellers, but rather was limited to

"holders" of the recommended securities. *Rowinski*, 398 F.3d at 303. The Third Circuit rejected this argument in light of the plaintiff's class definition: "All persons who maintained a Salomon Smith Barney retail brokerage account and who paid any charges[,] commissions or fees to Salomon Smith Barney." *Id.* According to the Third Circuit, "[t]his broad class definition is not limited to non-purchasers and non-sellers, and it necessarily encompasses claims by Salomon Smith Barney retail brokerage customers who purchased or sold the misrepresented securities." *Id.* Here, plaintiffs' argument fails for the same reason. Although plaintiffs' class definition scrupulously refers only to "holders," it is drawn broadly enough, like the class definition in *Rowinski*, to include any investor who purchased shares of the defendant funds between 1999 and 2003 and thereby became holders.[14]

In short, plaintiffs' state law claims are preempted by SLUSA. *See Atencio v. Smith Barney, Citigroup Inc.,* No. 04–5653, 2005 WL 267556 (S.D.N.Y. Feb.2, 2005) (concluding that state law claims for breach of fiduciary duty and unjust enrichment resulting from a kickback scheme between mutual fund groups and defendant brokers were preempted by SLUSA because the class definition necessarily included holders who had purchased shares during the class period); *Kircher v. Putnam Funds Trust,* 403 F.3d 478, 484 (7th Cir.2005); *Dabit,* 395 F.3d at 47. Thus, Counts Seven though Ten must be dismissed.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Complaint is granted; Counts One, Two and Six are

---

**14.** The Complaint defines the class as "all persons or entities who held one or more shares of Franklin Funds ... during the period March 2, 1999 to November 17, 2003." (Compl. ¶ 1; *see also* Compl. ¶ 111).

474

dismissed with prejudice; and Counts Three through Five and Seven through Ten are dismissed without prejudice. Plaintiffs are granted leave to amend their Complaint in accordance with this Opinion. In any event, because plaintiffs' Complaint alleges only derivative claims, plaintiffs' Motion for Class Certification and Motion for Leave to File a Supplemental Reply Brief in Support of Its Motion for Class Certification are denied.